UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

JACQUES E. MCCORMACK,
            *Plaintiff-Appellee,*

v.

COMPUTER SCIENCES CORPORATION;
POLICY MANAGEMENT SYSTEMS
CHANGE IN CONTROL SEVERANCE PAY
PLAN FOR SELECT EMPLOYEES,
            *Defendants-Appellants.*

No. 03-2095

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Cameron McGowan Currie, District Judge.
(CA-01-3009-3)

Argued: February 25, 2004

Decided: April 29, 2004

Before NIEMEYER, LUTTIG, and WILLIAMS, Circuit Judges.

_____

Affirmed in part, reversed in part by unpublished opinion. Judge Niemeyer wrote the opinion, in which Judge Luttig and Judge Williams joined.

_____

## COUNSEL

**ARGUED:** Mason Gardner Alexander, Jr., ELLZEY & BROOKS, L.L.C., Charlotte, North Carolina, for Appellants. Henry Scarborough Knight, Jr., CONSTANGY, BROOKS & SMITH, Columbia, South

Carolina, for Appellee. **ON BRIEF:** C. Frederick W. Manning, II, ELLZEY & BROOKS, L.L.C., Charlotte, North Carolina, for Appellants.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

NIEMEYER, Circuit Judge:

Following the December 2000 merger of Policy Management Systems Corporation ("PMSC") and Computer Sciences Corporation ("Computer Sciences"), Jacques McCormack, an officer of PMSC, terminated his employment by reason of a change in control of PMSC and claimed severance benefits available to him in such circumstances. He also claimed a bonus under a stock plan. While Computer Sciences tendered a severance payment to McCormack, McCormack disputed the amount, as well as Computer Sciences' refusal to tender any benefit under the stock plan.

Because the parties were unable to resolve their differences through internal procedures, McCormack commenced this action for (1) the larger severance payment to which he claimed entitlement and (2) a stock bonus under the stock plan. Following a bench trial, the district court awarded McCormack $359,550 in additional severance pay, plus interest and attorneys fees. It also determined that McCormack was entitled to the stock bonus.

On this appeal, we affirm the district court's judgment insofar as it awards severance benefits to McCormack, but we reverse its award of bonus stock to McCormack. Our reasons follow.

I

McCormack began his employment with PMSC in 1997 as a Senior Vice President and Controller of the company, and he became

a participant in the company's "Change in Control Severance Pay Plan" ("Severance Plan"). The purpose of the Severance Plan was to provide qualifying employees with severance benefits in the event that the employees suffered a constructive termination by PMSC as a result of a change in control of the company. Among other benefits, the Severance Plan provided three components for calculating an eligible employee's severance. First, paragraph 7(i) provided that an employee would receive three times his annual base salary at the time of termination. Second, paragraph 7(ii) provided that the employee would receive three times the greater of his target bonus for the year of termination or the actual bonus he had received during the previous year. Finally, paragraph 8(c)(ii) provided that the employee was entitled to the greater of the accrued annual bonus for the year of termination or a pro-rata amount of the target bonus for the period of such year through the date of termination.

McCormack also became a participant in PMSC's Restricted Stock Ownership Plan ("RSOP"). The RSOP required that participating executives own an amount of company stock consistent with an individualized annual guideline target. If an executive did not reach his target, one-half of his annual bonus was paid in the form of restricted company stock. In addition, under the RSOP, an executive would receive a stock "uplift," which amounted to additional stock equal to 25% of his bonus.

PMSC did not pay any bonuses in 1999. But in 2000, it targeted McCormack's bonus at $76,125, amounting to 35% of his $217,500 salary. The record contains no evidence that an actual bonus for McCormack for 2000 was ever calculated.

During the summer of 2000, PMSC entered into an agreement to merge with Computer Sciences, and the merger was consummated on December 27, 2000, when Computer Sciences purchased all of PMSC's outstanding stock. The closing of the merger constituted a "change in control," as defined in the Severance Plan, and amounted to a constructive termination event upon which participants in the Severance Plan could act to terminate their employment and receive benefits. The consummation of the merger, however, ended the RSOP.

On December 29, 2000, two days after the merger, McCormack wrote Pete Boykin, the President of Computer Sciences, and notified him that the acquisition of PMSC worked a "change in control," which, under the Severance Plan, constituted a "constructive termination event." McCormack further informed Boykin:

> [T]his letter is provided solely to establish and preserve my rights under the Plan, by notifying you that I consider the above described "constructive termination event" to have terminated my employment effective December 27, 2000. Without waiving any of my rights under the Plan I am pleased to provide services during the thirty day cure period set forth in the plan.

McCormack made himself available, as promised, and continued to assist Computer Sciences in the transition. On January 11, 2001, Computer Sciences advised McCormack that his services would no longer be needed beyond January 19, 2001.

On February 1, 2001, Computer Sciences tendered McCormack a check in the sum of $879,550, which it claimed fully satisfied its obligation to McCormack under the Severance Plan. McCormack disputed the amount of the severance payment, stating that it was miscalculated under the terms of the Severance Plan. McCormack noted that because he was constructively terminated on December 27, 2000, his severance payment should have been computed on the following basis: three times his annual salary, per paragraph 7; plus three times his targeted 2000 bonus, per paragraph 7(ii); plus a pro-rata portion of his 2000 targeted bonus, per paragraph 8(c)(ii). Instead, Computer Sciences had taken the position that McCormack was terminated on January 19, 2001 and therefore that his severance payment should be calculated with respect to the 19 days that McCormack had worked in 2001, not the 360-odd days that McCormack had worked in 2000. McCormack also disputed the fact that Computer Sciences provided no benefit under the RSOP.

Because the parties were unable to resolve their differences, McCormack commenced this action against Computer Sciences under the Employee Retirement Income Security Act of 1974 ("ERISA") for benefits to which he claimed he was entitled. *See* 29 U.S.C.

§ 1132(a)(1)(B) (affording participants in a qualified plan a private right of action to enforce their rights under the plan). In the course of the proceedings, the parties stipulated that Computer Sciences' acquisition of PMSC worked a "change in control" on December 27, 2000, and that, because McCormack suffered a material reduction in his responsibilities and authority, he had experienced a "constructive termination event." The parties continued to dispute, however, whether McCormack's termination occurred on December 27, 2000, as he claimed in his December 29 letter to Computer Sciences, or on January 19, 2001, as claimed by Computer Sciences when it indicated it would no longer need his services.

The district court determined that McCormack was entitled to date his constructive termination as of December 27, 2000. It also ruled that, because the RSOP's lapse occurred simultaneously with the "constructive termination event," McCormack was entitled to the "uplift" bonus of stock under the RSOP. The court included in its judgment a monetary award in favor of McCormack in the amount of $359,557.60 in unpaid severance benefits, $127,482.24 in interest, and $123,096.27 for attorneys fees.

This appeal followed.

## II

We review a district court's interpretation of an ERISA plan *de novo* and its findings of fact for clear error. *See Johannssen v. Dist. No. 1 - Pac. Coast Dist., MEBA Pension Plan*, 292 F.3d 159, 168 (4th Cir. 2002).

The issue on the claim for Severance Plan benefits reduces to the question of whether McCormack's employment with Computer Sciences terminated in December 2000, when he sent his notice of termination to Computer Sciences, or on January 19, 2001, when Computer Sciences no longer needed McCormack's services, as it had stated on January 11, 2001. For the reasons that follow, we conclude that McCormack's letter of December 29 effectively terminated his

employment and that that termination date provided the *date* for computing McCormack's severance benefits.*

The Severance Plan provides unequivocally that severance benefits are payable, based on the *date* of a "covered termination":

> The severance payment to be made shall be paid to the Eligible Employee in a single lump sum cash payment, net of any required tax withholding, within fifteen (15) calendar days after *the date* of the Eligible Employee's Covered Termination.

Severance Plan, ¶ 7 (emphasis added). McCormack asserts that the termination effected by his December 29 letter was a "covered termination" and that severance benefits therefore are payable within 15 days after that date. Computer Sciences, however, contends that McCormack continued working after December 29 and that he was not terminated until January 19, 2001, when the company told him his services would no longer be needed. In addition, Computer Sciences argues that even if the December 29 date were used, the effective date of a covered termination must be pushed back 30 days after the notice-of-termination date in order to permit Computer Sciences to "cure" the facts giving rise to the covered termination — in this case, a change of control. In essence, Computer Sciences argues that the 30-day cure period postpones the date from which severance payments are computed because only after the 30-day period can it be concluded that a termination was a "covered termination."

While Computer Sciences' position is not frivolous, we believe that the better reading holds that the cure period established in the Severance Plan is a condition subsequent that determines whether a "constructive termination event" qualifies to make the employee's termination a "covered termination." In providing a cure period, how-

---

*The district court found that McCormack's termination was on December 27, the date on which McCormack said his termination was effective. Because McCormack did not give notice of termination until December 29 and because the constructive termination event of December 27 was not self-actuating, however, we conclude that McCormack's employment terminated on December 29.

ever, the Severance Plan does not purport to change the actual *date* of termination. Paragraph 7 says that benefits are payable 15 days after the *date* of a covered termination. A "covered termination" is a defined term, to which paragraph 6 of the Severance Plan is devoted. Consequently, whatever is written in paragraph 6 determines whether the employee's termination was a "covered termination," but it does not, for purposes of the severance payment provided by paragraph 7, change the "date" from which severance payments are payable.

Under paragraph 6 of the Severance Plan, a termination is a "covered termination" if it follows a "constructive termination event," and a "constructive termination event" is defined as, among other things, a "material reduction in an Eligible Employee's title, position, reporting relationship, responsibilities or authority." In order for a "constructive termination event" to be *treated* as one under paragraph 6, the employer must have a 30-day period within which to cure the events giving rise to a "constructive termination event" — in this case, the change in McCormack's authority. Only after the cure period has been allowed may the "constructive termination event" be "*treated*" as a "constructive termination event" for purposes of qualifying a termination as a "covered termination," and, consequently, not until 30 days have elapsed can one know whether a termination qualifies as a "covered termination." But waiting this 30-day period does not postpone the *date* of the termination that an employee has posited as a "covered termination." It is only a condition subsequent that must be fulfilled before the original "constructive termination event" can be "*treated*" as one.

In the facts of this case, the merger between PMSC and Computer Sciences on December 27, 2000 was a "constructive termination event," and the parties have so stipulated. McCormack's letter of December 29, 2000 was a termination of his employment which he posited as a "covered termination" because it followed a "constructive termination event." Accordingly, under paragraph 7 of the Severance Plan, he would be entitled to severance pay as of that notice letter if it turned out that he was correct that his termination was a "covered termination." Because a constructive termination event could not be "treated" as one until the 30-day cure period elapsed, McCormack could not know on December 29 whether his termination was a covered termination. But by the end of January 2001, when the 30-day

cure period elapsed, he was able to know that his termination on December 29 was a "covered termination." Nothing in paragraph 6 of the Severance Plan, describing how a termination qualifies as a covered termination, purports to state that McCormack is denied the benefit of the termination *date* that was established by his letter of termination. Because his letter of December 29 terminated his employment, which by the passage of time could be treated as a covered termination, McCormack became entitled to severance benefits from December 29, not from some date in January 2001.

Accordingly, we affirm the district court's judgment insofar as it awards McCormack severance benefits.

## III

Computer Sciences argues that even if it owes severance benefits as of December 29, 2000, it has no liability under the RSOP because that plan ended when all of the PMSC stock was acquired by Computer Sciences on December 27, 2000. We agree. With the termination of the RSOP in the merger documents and the transfer of all of PMSC's stock to Computer Sciences, the plan no longer existed and could no longer function.

Accordingly, we reverse the district court's judgment insofar as it awards benefits under the RSOP.

*AFFIRMED IN PART, REVERSED IN PART*